IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 14, 2013 Session

## DEAN MOORE, ET AL. V. PAUL BROCK, ET AL.

**Appeal from the Chancery Court for Bledsoe County**
**No. 2447      Jeffrey F. Stewart, Chancellor**

**No. E2012-02247-COA-R3-CV-FILED-JUNE 21, 2013**

Dean Moore, Trustee for the Dean Henry Moore Living Trust ("Plaintiff"), Bobby Sullivan, and Willis Songer[1] sued Paul Brock, Sanford Quay, and Russ Quay ("Defendants") seeking, among other things, a declaration of a boundary line and a judgment for slander of title. After a bench trial, the Trial Court entered its order on June 19, 2012 finding and holding, *inter alia*, that Plaintiff has superior title over Defendants to the disputed real property, that the title Defendants claimed by quitclaim deed from Jerry Edmonds shall be held for naught, and that Plaintiff did not prove slander of title. Plaintiff appeals to this Court raising an issue regarding whether the Trial Court erred in dismissing his claim for slander of title. Defendants raise an issue regarding whether the Trial Court erred in finding for Plaintiff on the boundary line issue. We find that the evidence does not preponderate against the Trial Court's findings with regard either to the boundary line dispute or to Plaintiff's slander of title claim, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, and THOMAS R. FRIERSON, II, JJ., joined.

Edward L. Boring, Pikeville, Tennessee, for the appellant, Dean Moore, Trustee for the Dean Henry Moore Living Trust.

Stephen T. Greer, Dunlap, Tennessee, for the appellees, Paul Brock, Russ Quay, Martha Quay, Sandra Quay, and April Quay.

---

[1]Because Dean Moore is the only plaintiff involved in this appeal, we refer to him as plaintiff in the singular for ease of reference only.

# OPINION

## Background

Plaintiff filed this suit in November of 1993. For various reasons, the case was set for trial and then continued numerous times. During the pendency of the suit, defendant Sanford Quay died, and his widow, Martha Quay, and children, Sandra Quay and April Quay, were substituted as party defendants. Plaintiff Bobby Sullivan also died while the suit was pending and his wife, Ruby Sullivan, was substituted as a party plaintiff. The parties attempted mediation during which it was discovered that several other individuals potentially had interests in the real property at issue in this suit. Attempts then were made to add these other individuals to the suit as defendants. One of those other individuals, Albert Eugene Hughes, died during the pendency of the suit. In addition, one of the surveyors relied upon by the parties, Bedford Jackson, died during the pendency of the suit. The case finally went to trial in May of 2011.

Copies of the deeds in Plaintiff's and Defendants' respective chains of title were introduced as exhibits at trial. The deeds in Plaintiff's chain of title which were introduced at trial include, in order:

1) a 1935 deed from Edgar Pearson, Clerk & Master, to T.K. Potter conveying, in pertinent part, 420 acres;
2) a 1943 warranty deed from T.K. Potter to Willis Johnson conveying 716 acres;
3) a 1966 warranty deed from Willis Johnson, et ux, to Plaintiff, et ux, conveying 450 acres.

Defendants' chain of title contains the following deeds introduced as exhibits:

1) a 1935 deed from Edgar Pearson, Clerk & Master, to T.K. Potter conveying, in pertinent part, 420 acres;
2) a 1938 warranty deed from T.K. Potter to John B. Cowden conveying, in pertinent part, 420 acres;
3) a 1953 warranty deed from John B. Cowden to Minnie D. Stallard and Glenn Stallard conveying, in pertinent part, 400 acres;
4) a 1954 deed of correction from John B. Cowden to Minnie D. Stallard and Glenn Stallard, which states that the property was surveyed and that "the exact location of the land the exact amount has been determined and full consideration has been adjusted and paid, …," conveying, in pertinent part, 260 acres;

5) a 1967 warranty deed from Minnie D. Stallard and Glenn Stallard to C.D. Mills, Jr. and J.H. Greening conveying 260 acres;

6) a 1973 warranty deed from C.D. Mills, Jr. and J.H. Greening to Jerry B. Edmonds and Glendon Edmonds, and Marvin W. Webb and Dionna S. Webb conveying 260 acres;

7) a 1977 warranty deed from Marvin W. Webb, a single person, to Jerry B. Edmonds[2] and Glendon Edmonds conveying 256 acres;

8) a 1977 quitclaim deed from Jerry B. Edmonds and Glendon Edmonds to O.D. Pugh, Jr. and William E. Pugh conveying 256 acres;

9) a 1980 warranty deed from O.D. Pugh, Jr. and Barbara Jean Pugh, and William E. Pugh and Pamela Sue Pugh to H&H Enterprises conveying 245.59 acres;

10) a 1984 warranty deed from Dennis R. Hinch and Sue S. Hinch, and Kevin L. Hinch and Judy S. Hinch (H&H Enterprises) to the United States of America conveying 245.59 acres with a 40 acre exception;

11) a 1990 quitclaim deed from the United States of America to Paul Brock, Sanford Quay, and Russ Quay conveying 245.59 acres with a 40 acre exception;

12) a 1991 quitclaim deed from Jerry B. Edmonds[3] and Glendon Edmonds to Paul Brock and Sanford Quay conveying 256 acres less 3 ½ acres and less 245.59 acres.

Plaintiff Dean Henry Moore testified at trial that he had purchased 450 acres from Willis Johnson in 1965 or 1966. Plaintiff also purchased and sold other properties in the area, but the deed from Mr. Johnson to Plaintiff is the one which Plaintiff asserts this lawsuit concerns. Plaintiff testified that he did have his property surveyed. Plaintiff testified that he has had wells drilled on his property and has bush hogged parts of the property. The problems that led to the filing of this suit began in 1991 or 1992.

Plaintiff estimated that there are between 20 and 30 acres of property in dispute ("Disputed Area"). He testified that he painted his boundary lines, which included the Disputed Area, and stated: "My lines were painted and nobody made any objection to the paint or my paying the taxes." Plaintiff claimed that no one else made a claim to the Disputed Area for approximately 25 years. Plaintiff testified that Minnie and Glen Stallard

---

[2]This deed list the grantees as Jerrry B. Edmons and Glendon Edmons. The next deed in the chain of title spells the surname as Edmonds.

[3]In this deed the surname is again spelled as Edmons, but Mr. and Mrs. Edmonds signed their names as Edmonds.

never made claim to the Disputed Area, nor did C.D. Mills, Marvin Webb, Jerry Edmonds, O.D. Pugh and William Pugh, H&H Enterprises, or Farmers Home Administration.

Plaintiff admitted that when he negotiated the purchase of property with Mr. Johnson, Mr. Johnson told him there had been a dispute about the boundary line "but to not worry about it because the Clerk and Master of the court had awarded it to his predecessor and that the title was clear. And he would guarantee it." With regard to the dispute, Plaintiff stated:

> It did show up, but what he told me was, since the work had been done by the Court, that his claim was prior to the other and, therefore, he would guarantee it beyond a shadow of a doubt. And if it came back on me, that he would guarantee it.

Plaintiff admitted that he did not investigate the purported dispute nor did he hire his own surveyor to determine if there was a boundary line dispute. He stated that he "went with the surveyor that showed me the description, the deed."

Defendant Paul Edward Brock testified that he along with Sanford Quay and Russ Quay purchased property from the government. Sanford Quay died during the pendency of the suit, and his wife and daughters were substituted as party defendants in his stead. Mr. Brock testified:

> [W]hen I bought 40 acres out of this piece of - - out of this 245 acres, I bought 40 acres out of that prior to that from Pugh and I also got - - bought three acres adjoining that 40 acres by quitclaim deed. And at that time I learned that Pugh and that group had some other property there, but they indicated to me that they weren't interested in dealing with it because, like Mr. Pugh said while [sic] ago, they didn't want to go through a lot of surveying to survey all those little fringe areas because they were just wanting to sell the whole thing anyway.... So - - which that's where I learned that they didn't really have any interest in it. And, of course - - ... we decided we was going to try to buy that extra property, so Sandford and I did a search on the deed and we determined Pugh didn't have any interest that he wanted to get rid of, so - - ....

Mr. Brock testified that they figured out that 1938 deed from Potter to Cowden covered the Disputed Area. They then determined that Mr. and Mrs. Edmonds had an interest in the Disputed Area. Mr. Brock testified that at first he didn't know that Plaintiff claimed an interest in the Disputed Area. After he got the quitclaim deed from Mr. and Mrs. Edmonds, Mr. Brock heard rumors that Plaintiff claimed an interest in the Disputed Area.

-4-

Mr. Brock testified that he and his partners consulted with an attorney and then built a fence in the Disputed Area.

Mr. Brock testified that he and his partners purchased the Disputed Area in 1991 via the quitclaim deed from the Edmonds. Mr. Brock was asked if Mr. and Mrs. Edmonds had an interest in the Disputed Area at that time, and he stated: "I thought they did." Mr. Brock agreed that the deeds in Defendants' chain of title show that Mr. and Mrs. Edmonds had quitclaimed to Mr. Pugh prior to making the quitclaim deed to Defendants. Mr. Brock also admitted when asked that he and his partners paid one dollar for the property conveyed in the quitclaim deed from Mr. and Mrs. Edmonds. Mr. Brock and his partners paid $32,000 for the 245 acres they purchased and one dollar for the 26 acres of the Disputed Area. When asked how much they paid per acre for the 26 acres, Mr. Brock stated: "I've never figured it up. It was a legal purchase."

Mr. Brock testified:

Well, O.D. Pugh quitclaimed me three acres when I bought forty acres from him before. And at that time I've learned that he had no interest in it, so the person that did have interest in it was Mr. Edmonds…. O.D. at the time - - at the time I - - O.D. Pugh give me a quitclaim deed for three acres when I bought the forty and so he let me know that he was not - - he was not interested in it. Not that he didn't own it. He just wasn't interested in it.

When asked, Mr. Brock admitted that Mr. and Mrs. Edmonds quitclaimed everything they owned to O.D. Pugh. He further admitted that when he and his partners purchased the 245 acres, they did not get any of the blue area drawn on Exhibit 4 to represent the Disputed Area.

It was approximately one year after getting the quitclaim deed from Mr. and Mrs. Edmonds, that Mr. Brock and his partners built a fence in the Disputed Area. When asked if there was a house there when they purchased the property, Mr. Brock stated: "Not long. Hadn't been there long…. I think they had - - I think they had a well dug, yeah." Mr. Brock admitted when asked that he knew someone else was claiming the Disputed Area when they obtained the quitclaim deed.

Gene Reid, a registered land surveyor for twenty-five years, surveyed the real property at issue in January of 2001 and prepared a map. He explained that he also platted out Defendants' 245 acre property from a survey prepared by O.D. Pugh in 1976.

Mr. Reid stated that the problem in this case arises in the Defendants' chain of title out of the deed of correction from Mr. Cowden to the Stallards in 1954. Mr. Reid explained that Defendants claim title to the Disputed Area under the quitclaim deed from Mr. and Mrs. Edmonds in 1991. Mr. and Mrs. Edmonds, however, already had quitclaimed their interest to O.D. Pugh in 1977. O.D. Pugh then transferred property to H&H Properties. Mr. Reid opined that Mr. and Mrs. Edmonds did not have any interest to convey to Defendants when they made the quitclaim deed.

Mr. Reid testified that when he surveyed the property for Plaintiff, he found all of the corners called for in Plaintiff's deed. Mr. Reid stated:

> Number One is a stone that marked the southernmost corner of the property in conflict.… It's marked by a stone. It's called the - - in the deed it refers to the Sherrill Mine Tipple in several deeds. Corner Number 2 is marked by a stone. That's Mr. Moore's northwest corner of the property in dispute. Number [3] is Mr. Moore's northeast corner of the area in dispute and it's marked by a stone. And Corner Number [4] is a corner in this disputed line and it's marked by a stone.

Mr. Reid testified that he would mark the boundary line according to Plaintiff's deed.

When asked, Mr. Reid admitted that if you use the calls in Plaintiff's deed alone that the location of Plaintiff's property is offset from the position where he located it. The only point in common between the calls from Plaintiff's deed alone and Mr. Reid's plotting is point number 1. The other three points differ on the two surveys.

When asked, Mr. Reid admitted that Plaintiff's deed omits a call. He admitted that "[t]here is no way to make [Plaintiff's] deed close. You can't plot his deed out, because when it goes along the Old Savage Road, it doesn't give any bearings and distances. All it gives is a distance along the Old Savage Road. His closes other than that." Mr. Reid admitted that he supplied the missing call from Plaintiff's deed and further admitted that even after he supplied the missing call, Plaintiff's deed still does not close. Mr. Reid admitted that when he plotted Plaintiff's 450 acre tract per the deed even after he added the missing call, it still didn't close by about 300 or 400 feet. He agreed that if his conclusions were accepted, one would have to add a call to Plaintiff's deed that is not in the deed. The call missing from Plaintiff's deed also was missing from the prior deed in the chain of title from Mr. Potter to Mr. Johnson.

Mr. Reid also surveyed property for plaintiff Willis Songer. He testified that Mr. Songer's deed is not plottable, and that there is a discrepancy in one of the calls. Mr.

Reid stated: "A lot of these old deeds that are - - that were written years ago have a lot of calls left out and they also go the wrong direction and they all - - they have bad bearings, they have bad distances, which is that case."

Mr. Reid was unable to state whether the 1938 deed from Mr. Potter to Mr. Cowden in Defendants' chain of title covered the Disputed Area. He could not recall if the deed from Mr. Cowden to the Stallards conveying 400 acres covered the Disputed Area. Mr. Reid platted the deed of correction from Mr. Cowden to the Stallards in 1954 and stated that the description in this deed included the Disputed Area.

Several surveys were introduced as exhibits at trial. One of those surveys, introduced as Exhibit 4, shows a line that runs from points 1 through 4 and has a bearing that Mr. Reid testified first showed up in the 1954 deed of correction in Defendants' chain of title. This line was referenced in some deeds as the Cowden line or the Gardner grant line referring back to a grant to Gardner in the 1800s. A copy of a 1989 warranty deed from Harold Bowman and Velma Bowman to Plaintiff conveying 40 acres with an exclusion for 13 acres previously purchased by Plaintiff was introduced as an exhibit at trial. Mr. Reid testified that in the deed from the Bowmans to Plaintiff the first call in the deed is the same line as the Cowden line or Gardner grant line. Mr. Reid testified that if he were to resurvey the area, he would not survey between point 1 and point 4 as shown on Exhibit 4 because he believes that Plaintiff owns both sides of that line. Defendants contend that they own to the north and west of this line.

Oliver Donald Pugh, Jr. testified that he has been a registered land surveyor since 1972. Mr. Pugh testified that in 1975 or 1976, his survey crew surveyed a 256 acre tract he purchased from Jerry Edmonds and Marvin Webb. Mr. Pugh did not have any personal recollection about surveying the property because he said that his survey crew actually did the work. Mr. Pugh's crew surveyed using stadia[4], which Mr. Pugh admitted was not accurate. He stated: "There was no regulation then as far as accuracy. I bought the land for like a hundred dollars an acre, so I couldn't afford to go spend a hundred thousand dollars surveying it." Mr. Pugh purchased the property hoping to make a profit on it.

Mr. Pugh testified:

Well, I bought this 245 acres from Jerry Edmonds and Marvin Webb and there was a discrepancy between the road frontage, so I got Paul Brock to quitclaim me about a three-acre tract that brought it down to the road. Right in here. Of course, I don't remember this. Right here. Paul Brock quitclaimed - - it's

---

[4]The term stadia is not explained within the record on appeal.

about 200 feet wide down, …. Now, this won't be exact, but - - … it's something like right here and then the road frontage. And that's what's quitclaimed. Then when I sold - - I'll wait…. Then I sold Mr. Brock a 40-acre tract that included this, the triangle.

Mr. Pugh was asked if he was making any claim to the area on Exhibit 5 south of a blue line, which included the Disputed Area, and he stated: "I wasn't making any, but - - did I get a quitclaim to it or something? I'm not sure. All right? I'm talking about 30 something years ago. But, evidently, I got a quitclaim from Jerry Edmonds for 260 acres." When asked if he made any claim against Plaintiff, he stated: "Not that I know of."

In 1977 Mr. Pugh sent a letter to Plaintiff, which stated:

We recently purchased a 245 acre tract of land from Jerry Edmonds and Marvin Webb, that adjoins your property in the Brockdell Community. We are interested in selling all or any part of this tract.

Due to the fact that your property adjoins ours, we thought that we would send you a plat with the property line marked in yellow where we think your property line is.

If you are at all interested, please contact us as soon as possible.

The plat referred to in the letter was not part of the exhibit introduced at trial. Mr. Pugh explained: "See, when I buy a piece of real estate - - excuse me - - the first thing I do is call the adjoining property owners to see if they want to buy part of it, so I must have assumed he adjoined me."

William Arnold Boynton testified that he was employed by TVA as a nuclear security officer at the time of trial. Mr. Boynton was licensed as a surveyor in 2002 and had worked as a surveyor. Mr. Boynton was hired by Defendants to work on this case four or five years before trial. Mr. Boynton reviewed the deeds in both Plaintiff's and Defendants' chains of title and plotted some of the descriptions contained in the deeds. He prepared a plat of the property described in the 1938 deed from Mr. Potter to Mr. Cowden and reviewed both chains of title to do this. Mr. Boynton testified that the Disputed Area is located inside the boundaries of the 1938 deed from Mr. Potter to Mr. Cowden. When asked if he had any doubt that the 1938 deed encompassed the Disputed Area Mr. Boynton stated: "No, I don't. I do not."

Mr. Boynton testified that the Disputed Area is owned by Defendants by virtue of the 1938 deed and the 1954 deed. Mr. Boynton plotted the boundary lines per the 1954 deed from Mr. Cowden to the Stallards, which he stated included a call for the Gardner grant line. Mr. Boynton was asked about the deed of correction, and he stated:

> They made a Deed of Correction and it has to do with the Inman to Perry 66-acre deed with the corner. It appears to me that they had tried to - - they had erroneously run the line out as the Gardner grant line for the 1938 line and they stayed with this Inman to Perry line, their southernmost line there, going in a northeasterly direction, the one that's line in blue.

> When they made the Deed of Correction, they came back and got on the - - or they call that Inman to Perry deed. They also refer to it as the Johnson corner. And there is a Fate Songer deed. Then they put that all - - they tried to get all of that onto the Gardner grant line, which it cut the corner, the southeastern corner off of the Inman to Perry deed and went along the line that I've shown there.

Mr. Boynton testified that the Gardner grant line from the 1954 deed was carried forward in subsequent deeds in Defendants' chain of title.

Mr. Boynton was asked about the deed in Plaintiff's chain of title from Mr. Potter to Mr. Johnson in 1943. He was asked to assume that the Disputed Area already had been conveyed by Mr. Potter to Mr. Cowden in 1938 and to consider whether the 1943 deed from Mr. Potter to Mr. Johnson effected that, and he stated: "It - - there was a - - it caused an overlap in the two deeds. Yes, it would cause quite a dispute right there. There are several acres laying in there that was already sold." This is the origin of the dispute as far as Mr. Boynton knows.

Mr. Boynton testified that it is his opinion that the correct boundary line between Plaintiff's property and Defendants' property is the Gardner grant line shown in Exhibit 14 as the northernmost highlighted yellow line. The deed from Mr. and Mrs. Bowman to Plaintiff contains the Gardner grant line, which confirms the location of the Gardner grant line. In that same chain of title the previous deed, a 1946 deed, also contains a call for the Gardner grant line.

Mr. Boynton stated that the deed from the Pughs to H&H conveying approximately 245 acres goes around the Disputed Area. He further testified that the deed from the government to Defendants did not include the Disputed Area. The quitclaim deed from Mr. and Mrs. Edmonds to Defendants does encompass the Disputed Area.

Defendants are claiming title to the Disputed Area under the quitclaim deed from Mr. and Mrs. Edmonds. Mr. Boynton agreed, however, that in 1977 Mr. and Mrs. Edmonds conveyed all their interest to O.D. Pugh and William Pugh. Mr. Boynton was asked whether Mr. and Mrs. Edmonds had any interest to convey via the quitclaim deed to Defendants, and he stated: "That's not for me to decide, but he did - - O.D. Pugh did - - I have seen that deed, and O.D. Pugh didn't claim that part inside there. Then they went back to the Edmondses and got a quitclaim deed for the rest of it."

After trial, the Trial Court entered its order on June 19, 2012 finding and holding, *inter alia*,

1. That the title of the Defendants claim [sic] by virtue of a Quitclaim Deed from Jerry Edmonds recorded at Deed Book 133, Page 277, *et seq.*, in the Register's Office of Bledsoe County, Tennessee, be and is held for naught;
2. That the Plaintiffs have superior title over that of the Defendants in and to the disputed property and the Plaintiffs be declared the true owner of the disputed property, being that property as outlined and marked in pink on Exhibit "3" introduced at the trial of this case ….
3. That all fencing that has been erected in the disputed area by the Defendants be removed by the Defendants;
4. That all issues concerning slander of title claimed on behalf of the Plaintiffs not otherwise dismissed at the trial of this case are hereby dismissed based upon insufficient proof to sustain such cause of action;

In its memorandum opinion incorporated into the June 19, 2012 final order by reference, the Trial Court specifically found and held, *inter alia*:

[Plaintiff] essentially bases his case on a deed he received from Johnson to him. I think these deeds are all listed in Exhibits 1 and 2. I'm just going to refer to the last names. His surveyor, Gene Reid, said that this deed covers the disputed area. Johnson got his title from a Mr. T. K. Potter, and T. K. Potter turns out is a common grantor to both chains of title. Arnold Boynton was a surveyor, and he testified for the defendants, and he said that the deed from Johnson to the plaintiffs also covered the disputed area, rather the deed from Potter to Johnson covered this disputed area. He said, "This is what created the conflict," and he said it created the conflict with the 1938 deed that T. K. Potter conveyed to John Cowden, and that's the chain of title that the defendants claim ownership of this disputed area.

Now, Potter had bought a substantial amount of real estate in multiple counties at a Clerk and Master's sale in 1935. It was a court order sale. The descriptions weren't always the best in the world, but it was mostly, I think, you would categorize it as remote and mountainous, and the real estate in question was real estate located on the mountain.

[Plaintiff] bought his piece of real estate that he claimed title to in 1966. He testified that he's frequently visited his real estate holdings over the many years since and has spent time on the weekend and lived in a cabin for a period of time.

Regarding the use of the disputed area, I would have to say that his use has been what I would categorize as sporadic, but over a period of time different uses have been made. He said that what is consistent about it is though he painted his boundary lines and he's continued to keep them painted since 1966. And it was his un-rebutted testimony that he had no problems with any of the lines with the title holders who had held prior to the defendants under their title, that those names would be the Stallards, the Mills, Jerry Edmonds, Marvin Webb, the Pughs, H&H Industries, and Farmers Home Administration. He said he never had a dispute with them about where the property lines were.

He claims ownership of an area that's marked in pink on Exhibits 3, and I think it's blue on Exhibit 4, and I think it's pink in Exhibit 14. Those are the three exhibits that I refer to. He claims that he's made this claim under color of title recorded since 1966.

Now, the defendants, Mr. Brock and Russ Quay, and the heirs of Sanford Quay, counter that they have a superior title. They urge the Court to except [sic] the survey of Arnold Boynton showing what they refer to as the Gardner/Grant [sic] line as the true boundary line between the parties, and thus they claim ownership under their recorded deeds in 1990 and 1991. Boynton in establishing the Gardner/Grant [sic] line relied on the 1938 and 1954 deeds of Potter to Calvin and Calvin to Stallard respectively. He did not actually survey the descriptions, but rather plotted them, except for the Gardner/Grant [sic] line. He actually surveyed that line.

He also testified that the Pugh deed to H&H Enterprises or Industries of 245.59 acres, more or less, did not include the disputed area. And I point that out, because that is one of the deeds in the defendant's chain of title.

-11-

H&H Enterprises conveyed to the Farmers Home Administration 245.59 acres, and then the Farmers Home Administration conveyed that same 245.59 acres, more or less, to the defendants.

The proof shows that Pugh got his interest from a Mr. Jerry Edmonds in 1978. The deed to Pugh and others, I think it was O. D. Pugh and perhaps his brother or someone else by the name of Pugh. That deed was for 256 acres, more or less. Although Pugh's conveyance out of this was only 245.59 acres.

Now, Mr. Pugh is a land surveyor. He testified when he bought the 256 acres, more or less, from Edmonds, he concluded that he didn't own the disputed area, and he notified Mr. Moore about this.

Mr. Brock agrees that his deed for 245.59 acres, more or less, didn't cover the disputed area. He testified that he paid Farmers Home Administration $32,000 or the 245.59 acres. When he learned that the Edmonds' original deed was for 256 acres, he went to Edmonds and got a quick-claim [sic] deed, and I think the deed was a little confusing to me. It said for 256 acres minus 245.59, but I think that was minus what he had already received, and minus another three and a half acres. He gave a dollar for that quick-claim [sic] deed. He testified that he had done a great deal of research and came to the conclusion that there might be a gap in the titles to this real estate and even consulted with an attorney about it. Ultimately, he fenced part of this area and this action was participated [sic], or this lawsuit participated [sic] as a result of that fencing.

No other active usage was shown by the defendants, other than that, as I say, as the suit begins and after. I previously mentioned that Mr. Moore has made numerous conveyances out of this tract over the years, and there were sales for cash on contract and only a Mr. Milletello, if I've said his name correctly, appeared out of this group, and he was represented by Mr. Tommy Austin, and they reserved basically their issues pending the outcome of this trial, because those would be more in the form of damages.

I find that this is not so much then a matter of surveying as far as I could tell, the boundary location, as it is a question of title, who owns what. And it turns out on what the defendants own, and the claim turns on what rights they've got under the quick-claim [sic] deed from Edmonds. It seems to me that Edmonds in his sales transferred his total interest, 256 acres, to Mr.

Pugh. That was in 1978. I think that's in reference to item 8 on Exhibit No. 1. And then Mr. Pugh, on behalf of himself and the other owners, basically denied that he owned the disputed area in the letter to Mr. Moore, and through his actions in that respect. He made no attempt to convey it. I think if anybody owns it, it would be Mr. Pugh, that is, the remaining acreage, because Edmonds had conveyed everything to him.

Therefore, I hold that the title of the defendants claimed by virtue of the quick-claim [sic] deed from Edmonds, that's deed book 133, page 277, be held for naught, and that it be a cloud of blemish on the plaintiff's title, and those who may claim their title through the plaintiff, that is, a blemish on their titles.

So, I further hold that the plaintiff has superior title as to the defendants and has established itself as the true owner, and its ownership of the land and the disputed area as I have referred to it in the previous exhibits.

All fencing that has been erected in the disputed area by the defendants is to be removed by the defendants.

All issues as regard then [sic] slander of title not otherwise dismissed at time of trial or [sic] hereby dismissed as being insufficient proof of facts to sustain this theory.

Plaintiff appeals to this Court.

## **Discussion**

Although not stated exactly as such, Plaintiff raises one issue on appeal: whether the Trial Court erred in dismissing his claim for slander of title. Defendants raise an issue regarding whether the Trial Court erred by ruling in Plaintiff's favor on the boundary line issue.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address Plaintiff's issue regarding whether the Trial Court erred in directing a verdict with regard to his claim for slander of title. At trial, Defendants moved for a directed verdict on Plaintiff's claim for slander of title. The motion, however, should have been one for involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02(2). This Court discussed the differences between a motion for directed verdict and one for an involuntary dismissal in *Smith v. Inman Realty Co.* stating:

> Motions for directed verdicts pursuant to Tenn.R.Civ.P. 50 are appropriate in jury trials but have no place in nonjury trials. If a party desires to challenge the sufficiency of the plaintiff's proof in a nonjury trial, it must file a motion for involuntary dismissal at the close of the plaintiff's proof pursuant to Tenn.R.Civ.P. 41.02(2).

> The respective standards of review of the trial court's disposition of these motions is markedly different. In the case of a motion for directed verdict, the trial court must take the strongest legitimate view of the evidence against the directed verdict and must deny the motion in any case where all reasonable persons would not reach the same conclusion. However, in the case of a motion for involuntary dismissal pursuant to Tenn.R.Civ.P. 41.02(2), the trial court must impartially weigh and evaluate the evidence as it would after the presentation of all the evidence and must deny the motion if the plaintiff has made out a prima facie case.

> The manner in which the trial court reviews the evidence varies depending on the type of motion that has been filed. Motions for directed verdict require more certainty in the proof than do motions for involuntary dismissal pursuant to Tenn.R.Civ.P. 41.02(2).

*Smith v. Inman Realty Co.*, 846 S.W.2d 819, 821-22 (Tenn. Ct. App. 1992) (citations omitted).

With regard to claims for slander of title, this Court explained in *Brooks v. Lambert*:

> Slander or libel of title was first recognized as a cause of action in *Smith v. Gernt*, 2 Tenn. Civ. App. 65, 79-80 (1911). *Harmon v. Shell*, No. 01-A-01-9211-CH-00451, 1994 WL 148663 (Tenn. App. M.S. Apr. 27, 1994). To establish a successful claim for slander of title, a plaintiff must prove:

-14-

(1) that it has an interest in the property, (2) that the defendant published false statements about the title to the property, (3) that the defendant was acting maliciously, and (4) that the false statements proximately caused the plaintiff a pecuniary loss. (citations omitted).

*Id*. at *4. Statements made with reckless disregard of the property owner's rights or with reckless disregard as to whether the statements are false may be malicious within the scope of a libel of title action. *Id.* (citing *Gernt*, 2 Tenn. Civ. App. at 79-80). To assert this cause of action, the plaintiff must allege "malice … in express terms or [by] any such showing of facts as would give rise to a reasonable inference that [the defendant acted maliciously.]" *Waterhouse v. McPheeters*, 176 Tenn. 666, 669, 145 S.W.2d 766, 767 (1940). A good faith, but erroneous, claim of title does not constitute a cause of action for libel of title. *Ezell v. Graves*, 807 S.W.2d 700, 704 (Tenn. App. 1990).

*Brooks v. Lambert*, 15 S.W.3d 482, 484 (Tenn. Ct. App. 1999).

After Plaintiff's presentation of proof during trial, Defendants moved orally for a directed verdict on Plaintiff's claim for slander of title. The Trial Court heard argument on the motion, and the following exchange between the Trial Court and Plaintiff's counsel occurred:

THE COURT: Now, Mr. Boring, with regard to your proof, what evidence do you have of false statements or publication to third parties have been proven in your testimony in your case that affected this title other than this lawsuit that's pending?

MR. BORING: I don't think we have put on any proof as far as false statements, Your Honor.

THE COURT: All right. And with regard to malicious intent, other than making an inference by the fact that this lawsuit is pending, what other proof of malice do you have in the record?

MR. BORING: We don't have any.

THE COURT: I think that what you have said about good faith, the fact that they paid a dollar raises a question about good faith, but it looks to me like three elements have to be established. Your client has talked about pecuniary

-15-

damage and I suspect that he has established at least some. What amount may be subject to question. But you have said that you don't think there is any proof of malice and that there is not any proof of these false statements or publication prior to this lawsuit going on?

MR. BORING: I'm just saying the amounts, I think, could be inferred. If you go in and you get a piece of property from somebody who has no interest in that property and you lay a claim on somebody else's property, that's malicious.

THE COURT: I'm going to disagree with you. I'm not sure making a claim to property that is lawfully in dispute. That's where I think we are. I'm going to grant the motion for directed verdict and we will proceed on the boundary line dispute. All right.

Thus, Plaintiff's counsel conceded that they had produced no evidence with regard to Defendants publishing any false statements with regard to title to the disputed property. A review of the record on appeal shows that Plaintiff indeed failed to prove that Defendants published any false statements with regard to title to the property. Furthermore, we agree with the Trial Court that making a claim to property lawfully in dispute does not satisfy the requirement to show malice on the part of Defendants. As Plaintiff failed to prove two necessary elements of his claim for slander of title and, thus, failed to make a prima facie case, we find no error in the Trial Court's dismissing Plaintiff's claim for slander of title.

Next, we address Defendants' issue regarding whether the Trial Court erred by ruling in Plaintiff's favor on the boundary line issue. We begin by noting that as is the case in many suits involving boundary line disputes the testimony preserved in the record on appeal is often difficult to follow. Witnesses frequently point to or refer to something as being "there," with no reference whatsoever which would assist this Court when reviewing the record to determine what is being referred to by that witness. In addition, this record contains several surveys with multiple colored lines drawn upon them which do not necessarily match the testimony. For instance, the record contains the following exchange that occurred at trial:

THE COURT: Now, you made reference to a yellow line. I marked down that we are using pink, green, and purple so far.

THE WITNESS: Be green. I'm sorry.

MR. BORING: It looks yellow there.

THE COURT: He said yellow, and for the record, I wanted to be sure. We all may be color blind, but that was supposed to be green?

THE WITNESS: Green.

THE COURT: Is that what we are speaking of is the yellow line? That's all I wanted to be clear about. Thank you.

Q. It's yellowish green there. I don't know what happened to the color, but anyway....

In another instance while being questioned about Exhibit 3, Mr. Reid refers to "this red area right here." Exhibit 3 shows areas highlighted or marked in pink, yellow, purple, and blue. Nowhere on Exhibit 3 is there a red area. We point out these examples simply to highlight the difficulties inherent in an appeal so dependent upon exhibits of this nature, and note that the Trial Court when rendering its decision had the benefit of having seen the witnesses as they testified, including the witnesses' testimony concerning these exhibits.

Turning to the issue before us, we note that Tenn. Code Ann. § 16-11-106 provides, in pertinent part:

**16-11-106. Boundary disputes. –**

* * *

(b) In all such cases a complete deraignment of title by the complainant from a state grant or common source of title shall not be required as in ejectment cases, but it shall be sufficient to establish title in the complainant where the complainant proves clearly that the complainant is the true owner of the lands described in the complainant's bill.

Tenn. Code Ann. § 16-11-106(b) (2009). In *Thornburg v. Chase* this Court explained:

To prove clearly that the parties are the true owners, simply means:

[T]hat the complainant must prove that he is the true owner or that he had become entitled to the possession of land adjacent to the boundary line which he undertakes to have established, …

-17-

*Carr v. Wilbanks*, 45 Tenn. App. 372, 386, 324 S.W.2d 786, 792 (1958).

*Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980).

After a careful and thorough review of the record on appeal, we are unable to conclude that the evidence preponderates against the Trial Court's findings and ultimate conclusion "[t]hat the Plaintiffs have superior title over that of the Defendants in and to the disputed property ...." We find no error in the Trial Court's ruling in Plaintiff's favor on the boundary line issue.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the appellant, Dean Moore, Trustee for the Dean Henry Moore Living Trust, and his surety; and one-half against the appellees, Paul Brock, Russ Quay, Martha Quay, Sandra Quay, and April Quay.

_____
D. MICHAEL SWINEY, JUDGE